We'll hear our next case, Maxus. Just give us one second. Of course, Ron. One of my colleagues does everything on his iPad, and of course I'm quite jealous, but I also think that I'd be too nervous that I'd be missing something or whatever, but try to be old school. I'm all paper, Your Honor. Thank you so much. Go ahead, sir. Good morning, Your Honor. May it please the court. My name is Victor Ho for YPF, the appellants below. May I reserve five minutes for rebuttal? Go ahead. That's fine. Thank you, Your Honor. The Bankruptcy Court erred below in denying YPF's motions to disqualify the Trust Council based on the unprecedented and undisputed facts in this case for three primary reasons. Number one, the Bankruptcy Court applied the wrong legal standard and grafted onto the ENZO test a new exceptional circumstances requirement to a test that's been used successfully, I submit, within district courts and the circuit for the past 25 or more years. Second, the Bankruptcy Court misapplied Rule 110's requirement that a screen apportioned no amount of fees from a prior matter and validated the screen that was used here, which did not exclude the screened lawyer's spouse from receiving earnings from this matter. Number three, the Bankruptcy Court ignored and misconstrued substantial evidence, undisputed facts, that this court can and should review de novo, although disqualification is warranted, we submit, by any legal standard and any standard of review. We understand that... Well, yeah, it's been hard to wait for the three, so I was hoping that you'd just get to the end. Well, I appreciate your honesty. But I think you were close enough that I don't feel bad. So just as an initial matter, can we agree that there's nothing in the record that indicates Ms. Bol... Is it Bolter, is that how you pronounce it, Bolter? That's my understanding, Your Honor. Okay, Ms. Bolter is not a side-switching attorney, that this is really about a lateral move? It's a lateral move to the very firm, the very group that's litigating against her former client. Right, but I'm just talking about our understanding of side-switching versus lateral. This is not side-switching. Correct, it's a lateral move, Your Honor. Okay, good. So what concrete harm happened based on this lateral move? I think the concrete harm is pretty significant, Your Honor. Is Ms. Bolter... Is they holding what? Just getting to it, Your Honor. Oh, significant, yeah. Okay, the harm to YPF is the ever-present risk at its most sensitive secrets. In this Betha Company litigation, a $14 billion bankruptcy case are at risk. We would call them the nuclear watchdog. So the concrete harm is a risk? Correct. It's just a risk exposure? It is a risk exposure, given the magnitude of the risk, Your Honor. And as this court has held in corn derivatives close to 30 years ago, the potential that a client's confidences, a former client's confidences, could be revealed is enough to erect a prophylactic rule that disqualification under these extreme factors. So what you're saying, though, is that the risk is not... the screening doesn't mitigate that risk in any way? You aren't saying that, are you? I think what I'm saying, Your Honor, is that a screen here, just an ordinary lateral screen, does not give enough confidence and faith to YPF.  You want to disqualify an entire firm just based on a risk. That's very extreme. And then that firm then puts a screening mechanism in place, which I think everyone would have to agree reduces that risk. The screening doesn't increase the risk, and it's probably not neutral towards the risk. It reduces the risk. And then how much of a risk do you... and the bankruptcy judge found that the screening was complied with. And so how much of a risk now exists when there's a screen in place that's being complied with? First, Your Honor, I don't agree that it's been complied with. I can't agree to that. I don't know if it's been complied with. But it's been for so many findings to this effect, right? And you have the burden to prove to us that it hasn't been complied with if you want to make the risk more real, right? What I can prove, Your Honor, is that Ms. Bolter, during the two years that she was the engagement partner, one of the lead bankruptcy lawyers for this Beth Accompany case, was exposed to and helped to write the very playbook that we're now playing out in litigation. She's the lead lawyer. I am shocked that she billed $300 in two years. To a Beth Accompany litigation. A Beth Accompany litigation, that number, we should be adding zeros to that. At least, you know, maybe I'm old school, you know, my billing in the old days. But $300 is not a Beth Accompany. Your Honor, what I said was she was the lead bankruptcy lawyer. And that is absolutely clear. She is the lead bankruptcy lawyer. She billed $300, but the topics that she advised on are the nuclear launch codes that I'm talking about. We're talking about there could be nothing more sensitive than saying what your client's settlement strategy is, what its mediation strategy is, what its litigation strategy is. After the motion to dismiss has been denied, we're going to trial. She is involved in every aspect of it. In the last year that we're focused on, there were very few of those 300 hours were actually billed. If you want to talk about the first year, totally agree with you. But let's focus on this. You've been asked the question, and I'd really love to hear an answer. Is your position that no screen could be effective? Because, you know, if she had been billing a different amount of time, maybe, but we have a finding by the bankruptcy court that the screen was effective. And we have an interesting situation here, as I see it. We have, you know, both inclusionary and lateral screens are applied. So, you know, you've got it kind of coming from both sides, if you will. So I'd like the general question that you've already been asked, and I'd ask it again. Is any screen effective? And number two, you have the two main types of screens, the inclusionary and the lateral, that have been applied here. There's been a finding by the bankruptcy court that it was effective. How are we going to disturb that? Help us get there. So to answer the question directly, no, under these extreme circumstances, I do not believe respectfully that any screen would protect YPS competencies and would serve Corn Derivative's interest here, which is the protection of even the potential risk given the magnitude and the fact that you want to encourage clients to be candid with their attorneys. The viability of the attorney-client relationship is one based on trust, and that trust here was broken. And number three, the public confidence in the integrity of the proceedings. This is a case of international security. So all these things are risk factors. None of them are concrete harms. So if I may address that, why there is an elevated risk here, Your Honor, a couple of reasons. First and foremost, on their responsive brief and the red brief, there was the argument for why their system of screening is fine. And they said even then, under their system, there's no safe harbor. There's no safe harbor. They recognized for the first time that there are instances where a screen is insufficient. When? When there is a pattern. When there is noncompliance, a lawyer moves firms and has a history of noncompliance with the ethical rules. That is what the undisputed record below is. This isn't just a risk in space. This is a risk in this space. This lawyer violated Rule 1.7 a multitude of ways. The lower court said, you know what, it was a violation of 1.7 not to disclose a relationship. You can measure that in weeks, not years. We respectfully disagree, but weeks is enough. Did not disclose she was interviewing with her husband's, now husband's, law firm. At the time, this is, you know, arched enemies fighting $14 billion. This is an existential threat to YPF. You had a duty under Rule 1.7 to disclose that to your client, and you did not. And so now we get back to the risk. You're saying that an inclusionary screen and an exclusionary screen, exclusionary is on the individual. A screen is only as good as the promise you make that I'm not going to, on purpose or inadvertently, disclose something. And when you're exposed to nuclear secrets, the launch codes as we say, that's a clear and present danger every day, every day for YPF. It undermines the confidence that people have in the judicial system. So we're looking at Rule 1.10 here. Do you agree that that controls, that that's incorporated into the controlling rule for dollar bankruptcy courts? Yes, sir. And so if every letter of Rule 1.10 is complied with, right, this rule doesn't have to,  might have applied the wrong legal standard because you don't like the exceptional circumstances. But this rule I don't know has an exceptional circumstance provision. What about this rule went wrong? Because if this is the governing rule. Sure, Your Honor. Like what happened? How did this go wrong? Well, a couple things. First off, yes, 1.10 is a source. It is the rules that Delaware courts have adopted. But it's not exclusive. Why? Why? Because even the rule, if you adopt the rule, then you adopt the comments. And the comments to Rule, for example, 1.10, Comment 7, indicates, and I quote, even where screening mechanisms have been adopted, trivial, may consider additional factors in ruling upon motions to disqualify a lawyer from pending litigation. Indeed, the ABA, in their February 16, 2009 recommendation, Resolution 109, Resolution 109 indicates that although courts, and I'm quoting, although courts look to ethical rules for guidance on when counsel should be disqualified, standards for discipline do not bind tribunals called upon to rule on disqualification motions. So respectfully, although normally what we heard about in your last case was interpreting rules that were passed by Congress, what we're talking about here is rules passed by lawyers. Judges do not advocate their responsibility about inherent supervisory authority. I mean, yes and no, right? Like if a court, it's strange to basically say a third party will apply the governing standards that we want to use, right? It's a little unusual. Normally courts will make their own rules or do something like that, but it's not entirely uncommon in the attorney conduct space to do this. And if the local rule says we're using the ABA standards, it seems that we're just bound to Rule 110. Whether or not we get to the commentary is a different thing. Whether or not we get to other judicial standards is its own thing because this is a proceeding that started in bankruptcy court, and the bankruptcy court by its local rule says this is, we use Rule 110. So I still don't get why we're looking outside of 110 unless we ignore the local rule. Maybe we should? We're not ignoring it, Your Honor. We're supplementing it. Ignoring the bounds of the local rule then. We're looking at the local rule, and we're looking at the principles behind it. And if you look at Rule 1.7, for example, Rule 1.7 talks about, for example, personal conflicts. And it talks about how one of those ways and circumstances that a personal conflict can arise, the one that might challenge your loyalty to a client, is in the instance of relation by blood or by marriage. That's 1.7, Comment 10. So the rules itself, the ADA acknowledges that there is this concern. It's not just focused on the individual and that's it. You're looking at the relationships. Let me ask you a question about that. So you're obviously bringing Mr. Loria into this. As I understand the facts, the only argument with regard to him is this fees argument that you're making, right? Well, it's a couple things, Your Honor. The record is clear. There's nothing in the record with regard to Ms. Bolton telling him anything? No, I think it's just that relationship, Your Honor. He is the head of the group that's bringing this litigation against YPF. He is the head of it. The record also shows in a letter in October 2020, White and Case said he supervises this case. This is one of the cases that he oversees as head of the group. Yes, they said there were thousands of cases. I bet there's not thousands of $14 billion bankruptcy litigations. There's a reason why also in the record that both Sibley had this case when Ms. Bolton was the head of the group and also White and Case highlight this exact litigation as being one of the marked cases. Is there any evidence in the record that he's billed any time on this case? No, the record indicates that he says he has not billed any time. But the issue is he said he oversees the group and oversees this case. The optics of him representing in the past the Occidental Chemical Corporation, OCC, which controls three of the five seats on the trust that's litigating against the case. He was counsel of record there, and they said, well, he didn't bill any time. Okay, okay. But what you have here is he has a continuing duty of loyalty to Occidental. It is funding the operations of the trust, funding the litigation against. There's a revolver, as I understand it, a $15 million revolver and money that Occidental supports the litigation against YPF. And he's also sharing in the profits, the sharing of the profits. We learned for the first time 162 days after they were informed of this screen, only after filing this litigation, 162 days later did we learn for the first time that fees are not excluded. So anything earned from this litigation, say there's a big contingency award, $14 billion case, he is not excluded from receiving profits from that. And so we made the point below that it's their burden to show that this screen was compliant. But even if it isn't compliant, if it's compliant with the language of the rule, you can't allow a loophole like this. The rule was not designed for this extreme instance where one spouse joins another spouse's law firm, where he's the, where she could be either, it doesn't matter. If the head of the group that's litigating the case, it weren't designed for that. I'm confused by the argument you've just made. I thought the focus of your argument was on the fact that Ms. Bolter somehow, and we'll get into it, somehow would benefit from the compensation that Mr. Luria would derive as, you know, partner, head of the group, and so forth. What you've just articulated seems to be an argument that Mr. Luria, independent of Ms. Bolter, is violative of 110, and the fees that he's derived independent of Ms. Bolter are violative and of grave concern. That seems like a new flavor. Have I missed something? It's not a new flavor. It's really what I was getting at, Your Honor, was, and I want to focus on the conflict that it poses to and the danger that it poses to the screen as it relates to Ms. Bolter. The reason why I raise that is this is an unusual case and why the public perception of the integrity of these proceedings are at issue. So putting that aside for a moment, Mr. Luria, for a second, what we argued below is that they have the burden to show that this screen was compliant and that it's sufficient to protect against the risk and also to protect against the perception that the public might have of the bar and of the integrity of these proceedings. And what we said was that notwithstanding the burden they had, they did not prove that she would not receive and partake and share in any portion of the fees that now we know, 162 days into this litigation, that she's able to receive. But that's not what it requires, right? The comment 82110 says it's got to be the lawyer may not receive compensation directly related to the matter in which the lawyer is disqualified. What's the what's the evidence that shows that she would derive compensation directly related to the matter for which she's disqualified? And please don't tell me because they're married. You know, there's got to be more to it than that, right? I mean, well, there's there's nothing in the even though the court said I'm not going to consider any of that because I think it's irrelevant. We think it's directly relevant, Your Honor. And I don't think it's old fashioned, although we were called, you know, gendered and the like. I don't think it's old fashioned to presume that married couples share in the resources for richer or for poorer. I don't think that that is a dated or outdated concept to think that that relationship, that relationship is important within the context of ethical rules. And it's one that you as judges are bound by. Canon three, C1D. Judges, Your Honors, would disqualify ourselves not just because you have a financial interest, because your spouse would or because your child would. And so these are these are unfair. Forgive me for. No, no, no. I beg your pardon. But what's the compensation directly related? That's the language you want to say. It's all one marital pot. My wife would disagree. But what's the what's the evidence here? Well, we didn't we don't have any evidence. We don't have a declaration from either Miss Luria or Miss Bolter or husband saying we don't share finances. We don't share profits. The fact is, the record shows they cohabitate. Married couples do. They share. That is that is how could there be a loophole to the rule? The rule is there's something wrong about profiting from something where you used to have a conflict. You are disabled from, you know, from being involved in that case. There is something wrong in the public perception of the bar and integrity proceedings. If somebody is allowed to, nonetheless, through the back door, through the wonderful institution of marriage or just a deep relationship to share in that, that is wrong. And that's what the ethical rules. And even if the ethical rules don't specifically go towards this extreme example, the rules say you go outside and you look at agency law. And that's what we pointed out to in our brief. We talked about we don't ignore agency law that says that conflicts can arise when you act as an agent because you are related by blood or by marriage or by an important significant relationship. Indeed, the ABA is expanding that circle of what relationships of trust mean for conflicts purposes. So I don't think it's a stretch by any means. And it's certainly not unfair to have required, to have required Ms. Bolter to prove that she was not receiving a dime from this representation, especially when we're talking about a case of this magnitude. It would be, I think, untoward and undermine the public space in these proceedings. I had one question that I needed help with. You suggested in your introduction in the papers that you wanted us to look at the facts de novo, which seems antithetical to what I've learned in my time on the bench here. So help me how we're going to look at facts de novo. And cite for me, if you would, one of our cases that says we can do that. Or maybe I'm misunderstanding how you're framing this. Because I think unlike a trial record, for example, what we have here is a record that was closed and contained. We agreed to submit declarations sworn. We did not have live testimony. This is an instance where there's deference to a district court's observation of witnesses' credibility and their demeanor on the stand. We have a closed record of undisputed facts. When we're applying law to undisputed facts, we believe that's de novo. So are you basically saying this is like summary judgment? Because we review summary judgment de novo. And summary judgment usually has affidavits, deposition transcripts, stuff like this. And there aren't credibility determinations made at summary judgment. Because we don't want to make some credibility determinations on cold records. And so are you saying that this is a cold record, and therefore it's de novo? Had there been a hearing, you might not be able to say it's de novo. But you're going to say that because it was a cold record, it's de novo? Is that what you're saying? That is very similar. That is what I'm saying. I think it's the same principle. Even if it's on a clear error standard, we think that there was such substantial evidence that was simply ignored or misperceived. And this court does have experience in that. I'll just give an example of the Lanham Act, Your Honors. The Third Circuit reviews Lanham Act decisions in a multi-factor test, similar to what we're talking about here in the ENSO test, and look at all the factors and how it was balanced and have reversed a district court that failed to apply or balance the right factors. I think that was the McNeil case. So there are absolutely examples where Your Honor can look at this closed record and make determinations. And the reason why I say that, that no deference should be paid, is look at some of the factual record observations in the findings. The court takes issue numerous times with the fact that YTF had the temerity to raise and protect its rights on this disqualification motion, criticized the fact it had all these lawyers and implied that there were three or four lawyers or rotating cast of characters. In fact, in this bankruptcy litigation, there had only been one firm prior to my firm's involvement. It was Sibley and Austin. They mentioned all these other firms. That was the bankruptcy, underlying bankruptcy. That's the one that Ms. Bolter's husband was counsel's record to OCC, the one that controls the trust. So it was relevant somehow for YTF, but irrelevant for the other side, it wasn't fair. He mentioned something in particular I want to call this out. He said, I find it incredible, this declaration from the former CEO of YTF who submitted the declaration, that she had this confidential conversation, a cocktail, a crowded cocktail party. I find that incredible. But look at actually what the declaration said. It wasn't some public event. It was an invited guest. It was the senior management of YTF, along with their legal advisors and their financial advisors. A close event. They were celebrating their anniversary being listed on the New York Stock Exchange. So she was an invited guest. This wasn't a crowded cocktail party. And there was nothing in the declaration that said, and there we discussed sensitive things. What we talked about was we talked about the case. And what the record does say is that by e-mail, by written communications, by in-person meetings, this sensitive information was exchanged. So we think, again, the record evidence is super clear. I mean, your whole case comes down to whether or not the screens are adequate. That's what your case comes down to. Because we can't find for you unless we find that there was something deficient, structurally maybe deficient, in the screens. I don't know how we find for you unless we find the screens are not good. Because she did build time. She did have a relationship with the prior client, your client. But you really don't win unless, I don't see a path for victory for you, unless you can prove that either the screens weren't complied with, or you can prove that the screens are structurally deficient. Because the way that 110 works is it acknowledges that there can be issues at 1.7 and 1.9. But then it says when those exist, screens are ways around it. So really, it just comes down to, I mean, all these are reasons that there might be bigger or more prominent 1.7 or 1.9 concerns, right? But you have to show why the screens don't work. Do you have a nutshell for why the screens don't work, either structurally or factually? Factually, a screen in this case on these facts doesn't work for the very reason that the trust mentioned in their red brief, which is that a lawyer with a history of noncompliance, they concede that is an instance where a screen will not work. And that is precisely what we have here. We have repeated violations of Rule 1.7. Failure to disclose a relationship that the judge says, well, at worst it was a few weeks. Well, every day and every year that she failed to disclose this relationship. She pitched the client while she was dating, dating Mr. Lawyer, which is fine, which is fine. But what the rules encourage, Rule 1, is candor. Then have a conversation with your client. There was never that conversation, that moment to say, hey, I'm doing this. We don't choose who we fall in love with. Everyone understands that. That's human nature. But you hide that from your client for years or months, whatever the rule is, and then you fail to tell your client that I'm interviewing at the law firm that's representing my adversary, and in the very group that's bringing my case, that's another violation. And so that is precisely the example that the trust raised in their brief and said for the first time that that's the example that, you know what, that screen doesn't work in that instance. What's the amount of time that you say this secret was kept from the client? The specific amount of time, because you're so familiar with this, you can give me, I'm sure, an hour along with the number of days. So they started dating non-exclusively in 2017. They pitched this case. She pitched this case in July, June of 2018. So at some point in time, when they're cohabitating, maybe it's 2019, that they have a significant relationship. They don't get married until afterwards, to be clear. But at some point in time, there had to be a discussion. So there's no obligation? We think so, under 1.7. Yes, Your Honor. Okay. Yes, Your Honor. And, in fact, what the judge says below was, well, you know, ABA only came out with their opinion saying, okay, you don't have to be married. You don't have to be married. We'll make it official. You don't have to be married for me to consider that this is important for conflicts rules. That opinion came out in July 2020. So he says, well, okay, even if that applied, okay, but I'm not bound by that formal opinion. But even if that applied, okay, so her violation was a couple months. We respectfully submit that that opinion, the ABA opinion from July 2020, actually said by its own terms that they're talking about this is what the rule means. We're just making it clear they did not expand the rule. In fact, as we cited in our papers below, there were a number of different ethics opinions that were available for anyone to read that opine on that specific issue. It was just the first time the ABA did. But a history of noncompliance is different when you have a very, very, very clear rule versus when you have a rule that is ambiguous and sufficiently ambiguous that the entity that issued the rule feels the need to clarify it. So let me read, and that would only maybe see, I don't believe that it's ambiguous. I think people would understand. Well, the ABA, by your own reveries, the ABA, not your reveries, but the ABA suggested it is because they wouldn't have issued a July 2020 meeting to clarify if there wasn't some ambiguity. You don't clarify what's clear. You're right, Your Honor. So we could put that aside, even if that were true, which we can respectfully disagree with one another. But comment 10 to Rule 1.7, right? This is existing throughout the time period of the relationship. And certainly the time she started interviewing in August of 2020. The interviews which led to her joining White Case one month later. Comment 10 is crystal clear. One of the instances where that personal conflict arises, duty of disclosure, notice to your client, when a lawyer, and I'm quoting, when a lawyer has discussions concerning possible employment with an opponent of the lawyer's client, such discussions can material limit the lawyer's representation of the client. So this is right there. At the same time that she, and the record is, again, undisputed, she is part of the team, she is receiving to the very last day confidential communications of YPM. She is billing the client. She is the one sending the bills to the client. She's in the presentation deck in August of 2020, one month before, saying, okay, this is our trial scene. This is what we're doing. Her face, her qualifications. She was the only person left at Sidley & Austin. And then, you know, by the time, in terms of senior leadership on the bankruptcy side, she was the one. And what happened? The trust canceled during this time period. Not only recruited her, took away the entire senior bankruptcy department of Sidley. Took everybody. That's in the record. It took 10 lawyers, 11 lawyers. So what this really is saying is that it's okay to do that. It wasn't the entire department, it was just the senior most folks. So this is a fairly brazen move by the trust. Well, the senior person at Sidley who left didn't go to White & Case. He went somewhere else. Correct. Right? That's correct. A bunch of people left. They didn't all go to White & Case. Mr. Conlon left and went to a different firm. But as the record shows, all the other, the co-head, Mr. Kazina, went to White & Case. Senior litigator, I think it was like 10 to 11 lawyers left to White & Case. So what we're talking about is a fairly brazen move by the trust counsel. They knew they were flying close to the sun. They saw ENSO, everyone read it. ENSO, as your honors will know, is the case that we cite. It was the rule in Delaware. 10 hours. 10 hours. The lawyer wrote mediation or, you know, a piece about mediation, so would have had to candidly evaluate the strengths and weaknesses of the case, was described by Judge Andrews back then as significantly less typical lawyer. What we're talking about here is now the lead bankruptcy lawyer, the person that there's no dispute that YPF and its most senior leadership believed was their lead lawyer. So this is a far cry from ENSO. It's not respectfully, in my view. ENSO was an eight-person law firm. Correct. And I think it cuts, again, this is a different circumstance. White & Case doesn't get bigger than that. I get that. Okay, I get that. But the risk is still the same. Why? It's a different kind of risk. What we're talking about is the number of lawyers on a case of this magnitude. You're talking about getting it right 100% of the time. When you're talking about a team, they've identified 95 lawyers that might have worked or, you know, what we said was one in seven lawyers in terms of the bankruptcy group of New York and the like. You're talking about a significant number of lawyers that work together on a daily basis, whether it's Zoom or in person, and the fact that you increase every time you bump up against each other, you're working together. On an unrelated case, something could slip out. That risk bumps up. And that's what the District Court of New Jersey found in the Sennett case, that when you have a case like that, it's a big, high-profile case. A lot of people are going to be working on it. They're working on the same group. I get that Wyden Case has offices in Riyadh and Doha. Okay? We're not talking about that. We're talking about the world of Betha Company, U.S. bankruptcy litigation, and that group is relatively small. The 11 people that you're alluding to, 10 or 11, I think you said, wasn't she the only one working on the YTF matter? That is correct, your Honor. To our knowledge, she was the only one. All right. Can I just go back just maybe to give the mic back to you? I posited a while ago that the only path to victory I see for you and your client is proof that the screens don't work. I said, as I see this case, you could make factual proof. And you said, I have factual proof. I have a history of noncompliance. I also posited that there might be structural deficiencies just so that no screen could ever work under these circumstances. It strikes me that's a little intention with Rule 1.10. So do you rest only on your factual point that the screens didn't work, or do you raise a structural point that no amount of even perfectly implemented screenings could cure these conflicts? The latter, your Honor. We don't believe that this screening or any screening, given the severity of the circumstances, the undisputed fact that we have here, the fact that she has the nuclear launch codes, we don't believe that any screen would. But on the specific facts, we believe that given the history of noncompliance, this is exactly the example. Let me just test that structural point. Because Rule 1.10, I mean, it kind of gives and it takes, right? Or it takes and it gives back maybe. It basically says if a lawyer has a personal conflict, then that's going to be imputed to the firm. So it starts with a pretty big sort of almost taint. And that says, oh, by the way, we can scale that back through screening. And so Rule 1.10 doesn't really contemplate that there would be a breaking point or a structural point at which no screen could ever work. And what you seem to be saying is this is the case. That's exactly what I'm saying, Your Honor. And even if there is strict compliance and even if we were to agree that the screen was perfect, which we don't because we said it doesn't exclude payments to Mr. Loria, okay, but put that to the side. This is that space in between. Even if there were a perfect screen, there is a gap between that and your inherent supervisory authority, something that the rules contemplate expressly and that the case law expressly contemplates as well. And I go back to foreign derivatives and the cases after that. That makes crystal clear that disqualification is designed as a prophylactic. It's a prophylactic, not of a materialized risk, although certainly we believe there is a clear and present danger. We don't know if that risk has been materialized. But you have to prevent even the potential that a former client's confidence is maybe used against him. And you have to encourage people to be clients, to be candid with their lawyers. If they realize that someone could move without notice, this is a unilateral screen, just to be very clear, Judge Phipps. The fact of this case is that this was foisted upon them. It wasn't, hey, I'm leaving, I'm going to another firm, the firm I chose of all the firms in the world and of all the groups just happens to be White & Case and it happens to be the group that litigated against you, but please, you know me, you trust me. That didn't happen. The rules encourage lawyers to be candid with the clients for a reason, so that conversation could occur. That conversation didn't happen, and there's no evidence that it did. In fact, there's evidence to the contrary, it didn't. So, but don't worry, YPS, just trust me, just trust me. I violated Rule 1.7 for even if it's months, if not years. I didn't tell you I was interviewing, even though the rules are clear that I have to, but trust me, because that's the end of the day, what a screen is. It's your word that I'm going to disclose it, either on purpose or inadvertently, and the risk here is elevated because the very head of the group that oversees this case by his own words is her husband and living there, receiving proceeds from this case. So for those reasons, we believe the only thing that protects… Yeah, but given the record that he's… I mean, look, I guess any partner at any firm, there's some minuscule percentage that you could argue everybody participates in the compensation, but there's no direct evidence that it's violated of 1.10, right? I mean, we've had a discussion about compensation directly related to this matter. He's not involved in this matter. So is the argument just that sort of ethereal, he's a partner at the firm, it's part of the revenues of the firm? Correct, and what they told us in their interrogatory response, which had to be supplemented on March 12, 2021, was cash receipts from fees earned by White and Case in respect of this litigation are not expressly excluded from his equity distribution or discretionary bonus. So, for example, in the future, if there is, for example, a huge contingency fee on a $14 billion case, nothing excludes him from receiving, as the head of the group, one of their most prominent cases, receiving a bonus. Discretionary, right? Nothing. A screen is supposed to prevent that, and this screen did not. And so... With the person of the conflict. I mean, who's married to this person who's the head of the group. But you need... It's not a tax lawyer, it's not somebody removed from these proceedings, all right? It's not, I married, you know, somebody at the firm, but it's an M&A partner in Dubai. That's not what we have here. We have in the very group that's litigating, and the head of the group that's litigating this case. Do you have any more? Okay, thanks so much. Thank you. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. My name is Kate Stetson. I represent the Maxis Trust. I'd like to address several of Your Honors' questions, particularly about risk and knowledge, but I want to start actually with something that Mr. Ho said, which is about trust. Because the other trust relationship that Mr. Ho neglected to mention is that courts trust that lawyers appearing in front of them abide by their ethical obligations. The public trusts that lawyers abide by their ethical obligations. So here, what Mr. Ho, I think, is imposing is a presumption that Ms. Bolter will not abide by hers. And just to be clear about what YPF is concerned about. YPF is concerned, as you heard Mr. Ho say, that Ms. Bolter will reveal what he called the nuclear launch codes of the litigation. Ms. Bolter herself, I think as Judge Greenaway, you mentioned, is not a litigator, but that she will reveal the nuclear launch codes to whiten the case. I want to be very clear on this. Ms. Bolter has, under Corn Derivatives, like every lawyer has, a duty to her former client not to reveal those confidences. She is screened, Judge Greenaway, as you mentioned, both exclusionary and lateral screened from this matter. And what that means in practice is she cannot speak about this. She cannot be spoken to about it. She cannot access any documents related to it. And in response to one of your questions, she has not revealed, and this is in the record and uncontested, any confidential information about her former client at any time to anyone at whiten the case. And she understands that the ethical screens that she is subject to have teeth. She is subject to severe disciplinary consequences. That's joined Appendix 514. One of the observations here that we made repeatedly below is that YPF never has sought any kind of modification to those screens. What YPF said, and you heard Mr. Hope commit to it again today, is that there is no screen, no matter how rigorous, no matter how well complied with, that will suffice in these circumstances to protect YPF's confidences from being revealed. But that, under Rule 110, is not the way the disqualification analysis works. I want to touch on this question about de novo review versus clear error or what we think is abuse of discretion review. In our view, YPF has attempted to position this case as a question of law because, of course, that enables it to seek a much more rigorous review from you all. In our view, and under IBM versus Levin from 1978, the disqualification order and all of the intensely factual inquiries that go into it, and that's from the intellectual ventures case, a case that YPF was fond of citing below but didn't cite here, the intensely factual nature of the disqualification motion means that you review for abuse of discretion. What the judge concluded in his discretion here was that the screens that were put in place, the lateral screen, the exclusionary screen, the commitment that Ms. Bolter made, the statement she made about not revealing any confidences, and the teeth on those screens are all important indicators that the screen was working and would be complied with. Can I just interrupt? I'm really sorry because you're on a streak.  and abuse of discretion. It strikes me that it's one thing to say that we have de novo review over the factual record. It's another thing to say it's a discretionary call of the trial court as to which way to go. If a court wants to postpone a trial or something like this or continue a matter, you might say, well, these were the facts that were before the court when they made that decision. There may be de novo review on whether those facts were right or not if they're all memorialized, but then we would look at that continuance decision through an abuse of discretion. Isn't this kind of one of those hybrid cases where we can peer into this cold record facts de novo but still preserve the abuse of discretion point to say, you know, it's still the bankruptcy court's discretionary call as to whether to grant that or not. I think maybe where Mr. Ho and I would part ways is over what's a fact finding and what's not. I know that bedevils courts as well and that's why you think about mixed questions. There are cold record facts. There are 85 lawyers in the restructuring group. The cold record fact is that this case, the adversary case, is being handled by the litigation practice. The cold record fact is that there are 10 floors of White and Case in New York with 70 offices on each, and Ms. Bolton, number one, hasn't been to New York, and number two, when she does, is not going to be seated anywhere near the litigation folks who are handling YPS stuff. All of that are cold record facts. There are other elements, though, that Judge Sanchi found that I think are both facts and particularly relevant to his ultimate discretionary ruling. He found that she is a very well regarded attorney. He found that she understands her ethical obligations. He found that she has agreed that she will not be apportioned fees, and we'll talk about Mr. Loria in a few minutes. He found that she understands there are severe consequences to her breaching those ethical rules, and he found, importantly, with respect to Mr. Ho's incantations about Rule 1.7, and this is at Joint Appendix 29, Mr. Ho was citing you to Joint Appendix 28. 29 is where Judge Sanchi says, in any event, even assuming that Ms. Bolton should have revealed that she was dating Mr. Loria to her client, there is no link whatsoever to that obligation and what we're talking about here. That's a finding as well. He went on to find, on that same page, that the attempt to bring up Rule 1.7, which didn't happen until the reply below, was what Judge Sanchi called a shabby attempt to embarrass Ms. Loria. All of those are factual findings, and all of those, we think, are subject to clear error review. I do think you're right that the ultimate question, at the end of the day, for both of us is, was this an abuse of discretion? I don't think that Mr. Ho is able to contest that too much. I think where Mr. Ho comes down is that it is, per se, an abuse of discretion for this type of case, where you have a partner with, Judge Greenaway, as you pointed out, 300 hours over two and a half years on a matter, to move to a different firm, one where she is married to the head of the restructuring practice. His rule is that that's a per se disqualification. There is nothing that can save that, no screen that can save that. This court, of course, as the Delaware District Court in New Mears pointed out, has long held that when you're talking about disqualification motions, there are no per se rules. This court has never engaged in that kind of categorical inquiry, and for good reason. What the bankruptcy court has in front of it isn't just the cold record of facts. What the bankruptcy court also had in front of it was a case that Judge Sanchi has been handling for years, and Judge Sanchi understands, among other things, some of the litigation tactics that were engaged in below, and we think those were and fed into part of the disqualification analysis that Judge Sanchi could have used. Now, with respect to Mr. Ho's two main arguments, I would say that when he was asked, what is it about this case that makes the screen insufficient, he referred you to section 1.7. We've already dealt with that. His two main points are knowledge and marriage. So knowledge, Mr. Ho's point is, this was a very important partner to us. She wasn't a litigator. Yes, as they said below, her involvement ebbed and flowed, particularly after discovery began, because she doesn't get involved in discovery, but she was important to us, and she worked all these hours. But as we point out in the brief, and you can see this in the joint appendix, I think it's volume three, the ABA entertained a rule 12 or 13 years ago that would have required that kind of substantiality or materiality finding, and would have said that somebody who had a substantial material relationship couldn't be screened. That is not what the ABA concluded in 2009. What it concluded was that a rigorous screen, one where proper notice was given, and there's no dispute here, would suffice. Marriage. What I think Mr. Ho's argument boils down to is that because Ms. Volter is married to Mr. Loria, she can't possibly be expected not to talk. What he said below in the hearing, and you can see this in joint appendix 285, is sometimes the love is so deep that it compromises your duty of loyalty, because you want your boyfriend, your fiance, your husband to do well, and therefore you're going to compromise your duty of loyalty to your client. With respect, that is not how it works. Ms. Volter has an uncompromisable duty of loyalty to her former client. The fact that she's married to Mr. Loria is completely irrelevant. I want to make a couple points about Mr. Loria. I want to respond to his point about the compensation directly related to the matter. That's the language, and I take it from Mr. Ho's response that there's no way to deny that compensation that Mr. Loria would derive would be shared with Ms. Volter so that the language would be satisfied of compensation directly related to the matter. I don't think that's accurate. First of all, I think as Judge Fitz observed, what we're talking about here is a rule that says the disqualified lawyer shall not receive any part of the fee thereof. The first presumption, because there's nothing in the record, is that Ms. Volter and Mr. Loria share a bank account. That may be a presumption, but it's not one where there's any evidence that's been worn out to show that they share even an account. You're already taking a step towards something that has no evidentiary support in concluding that whatever Mr. Loria receives, and we'll get to that, is going to somehow inure to Ms. Volter's benefit. That's flaw number one. Flaw number two is Mr. Ho is fond of citing the comments to the model rules, but one of the comments to the model rules says when we talk about a fee directly related to the matter, we're not talking about things like a partnership share or a pre-negotiated fee. Here, Mr. Loria receives a partnership share. You can see this at Joint Appendix 796. Mr. Loria, this is a response to a discovery request, gets no credit for White and Case's representation of the trust. He receives no fees from that arrangement. And Mr. Loria was accused several times here of overseeing the case. I want to be clear on this too. Mr. Loria is the head of the restructuring practice. Mr. Loria entered an appearance in the underlying case. White and Case, as a firm, has not worked on that underlying case since 2017, and Mr. Loria billed no time to that underlying case. So even if we start talking about Rule 1.7, which, by the way, is a personal conflict, it's one that has to do with whether you're going to zealously represent your client if your husband or wife is on the other side, even if we're going to talk about Rule 1.7, Mr. Loria, who represented Occidental for a hot minute in 2016 and never billed any time, and Ms. Bolter were not opposite each other even in the same case. So the assumptions and the presumptions and, frankly, the insinuations that all bear on this question about fees somehow inuring to Ms. Bolter's benefit I think are all quite beside the point. Let me ask you a question about the scope of what we can look at. I think there was some question brought up in the papers whether we could look at the entire certified order, and obviously we have the Nortel case that I think is pretty clear on that, but if you have some other thinking on it, I'd love to hear it. Sure. So our point, just to be clear, is not that the court somehow lacks jurisdiction over certain aspects of the order. Our point is when you have a process under Section 158 that first requires the bankruptcy court to certify what that court concludes are unresolved questions of bankruptcy law, query whether this is a bankruptcy law question, but we'll set that aside, unresolved questions of law, and that this court has the discretion to grant review. Our point is that there are several cases, some of them from the Fifth Circuit, that talk about the need to ensure that the purpose of 158 is satisfied, which is the reason 158 was passed in the 2000s was precisely so that bankruptcy courts and practitioners would have more of a pool of bankruptcy appellate law that they could draw from. And as courts had pointed out, the Fifth Circuit, in a case I'll find in a moment, I can't remember, but courts had pointed out that when it comes to accepting review, if you start looking expansively at some of these other questions, for example, the ultimate abuse of discretion question, the Rule 404.1.7 argument that sometimes appears in the briefing and sometimes doesn't, and I see my time is up, but if I could wrap up. No, I'd love to hear the end of your question. I think where we land now, I would say, is after all of this briefing, after this lengthy argument, we think you should resolve whatever questions you wish to resolve. Our point in the briefing was that you are empowered to decline to resolve some of the questions that YPF's brief raised that weren't certified or that appeared a little bit late in the briefing, like the reply. If I could make one closing point just with respect to the adequacy of the screens, the YPF brief cites a number of cases from the district court talking about adequacy of screens, and I want to make one overarching point on them. Judge Phipps, you asked the path to victory is to show, essentially, that the screen wasn't sufficient. If you look at the cases that Mr. Ho cites in the brief, what you'll find is that every one of them has a fatal flaw, either in the timing or in the screen itself. So Enzo, the case that comes up quite a bit, Enzo was a case where a lawyer joined a new eight-person firm, as you said, Your Honor, as a named partner. One year goes by without any screen, and then that firm attempts to enter an appearance on the other side of a client that this named partner represented. That's Enzo. Decorah, another case YPF is fond of citing, the screened lawyer worked on the screened matter, wasn't screened until after the motion was filed. James v. Teleflex, no evidence of when the screen was implemented, the district court found, no evidence of notice to the opposing party as required. Norfolk Southern, a ten-attorney firm, no disciplinary consequences attached to that screen. And here, as I've mentioned, there are teeth that are attached to this screen and no provision, as we were more recently discussing, on fee apportionment. So all of those cases, most of them, by the way, predate the new rules, but all of them have that kind of fatal flaw, Judge Phipps, that you were talking about. There is no flaw in this screen. YPF has not identified a flaw in this screen. YPF's point, essentially, is that Ms. Bolter can't help herself but talk. And that's not true. Is your position that if the screen is perfectly compliant, that's the end? We can't look any further? Let's assume this screen was perfectly compliant. Should we just close up and decide the case in your favor, or can we look beyond that perfectly compliant screen for extraordinary facts? I think what I would say is if we were in the bankruptcy court, if you were a bankruptcy judge and you asked that question, I think I would say that the court, and we argued below, that the court is free to look at other things. As Mr. Ho pointed out, there's a comment in the modern rules that says you can look at other things in order to disqualify a lawyer, by the way, not a firm. That's why I'm hesitating, because if we were in the bankruptcy court, you might look at other things. Here, I think the question is, with the court having found the screen to be compliant, having found that Ms. Bolter has committed to not violating those obligations, having found that those obligations have teeth, and having found that all of the insinuations about the marriage in Rule 1.7 have no link whatsoever, Joint Appendix 29, we think that's where you should stop. Let me just follow up on Doug Porter's question, because it strikes me that we're trying to follow Rule 1.10. Rule 1.10 does not contemplate a structural flaw with a screen in which there could be such a huge problem that no screen would ever suffice. I mean, 1.10 is really strange. It almost starts with the premise that there would be bases for disqualification, 1.7 and 1.9. So it almost starts with problems, and it gives solution screens, and it has structure to those screens. So I guess my thought is, if we're limited to 1.10, I'm at a loss for finding a way just on the meets and bounds of 1.10, not the common, but on the meets and bounds of 1.10, where a screen could be structurally deficient. That's not what I see. It seems that there's other kind of talk, maybe court's inherent powers, maybe something else like this, to say even if the screens meet 1.10, it's just too much. We can't go there. It's too great of a structural risk or appearance. What do you think? You think that there is the possibility for courts to kind of look beyond 1.10, even though it's incorporated by local rule, and say what we're dealing with here relates to the integrity of proceedings. Courts have to then lift out and look a little bit more for something extraordinary? Or should we just say, no, 1.10 starts with problems. It gives solutions. It doesn't contemplate that those problems would ever be too big for the solutions that it gives. I think you're right, Judge Fitz, and you pointed out earlier that rule 1.10, take it away and then give it back. I don't think that a bankruptcy court or a district court asked to hear a disqualification motion is somehow circumscribed by rule 1.10 always to rubber stamp no on a disqualification motion as long as the screen's compliant. I think that goes to your point about the court's equitable authority. Even the ABA, I think, recognizes, and this is in the comments, that there may be circumstances where an entire firm picks up and joins a new firm, where even if you have a screen that the structure of the screen simply can't adequately ensure, reasonably ensure, that those confidences won't be disseminated somehow. I think there are cognizable circumstances, and I think we conceded in our brief that those circumstances hypothetically could exist where the screen wasn't enough. Our point here is the bankruptcy court correctly found that this was not one of those cases. This is a mine run case of a partner laterally moving to another firm. This firm has been representing the Maxis Trust for years. What Mr. Ho didn't mention as well is that that's part of the balance here, too, is that clients have an entitlement to have their firm represent them, particularly after several years of hard-fought litigation. Are there no further questions? Great. Thanks so much. Thank you. Your Honor, so I'll just address a few points on rebuttal in response to Ms. Stetson's comments. First, she said this is a bankruptcy litigation, and Ms. Bolter is a bankruptcy lawyer, and the two shall meet. Of course, this litigation that she pitched for and was hired for was always a bankruptcy litigation. So from the very beginning, the case that she was pitching for was this adversarial proceeding. So, yes, it is done by litigators. But as we pointed out below, and the record is absolutely clear, the litigation group also are badged as restructuring lawyers. They work in the same group. And as we pointed out, Mr. Schor, the lead lawyer for the trust below, has worked on 25 cases with Mr. Loria. So they work very, very closely together. And as we point out, again, in the record, they mention their names in the same, as the highlighted folks that they go to litigation for bankruptcy litigation of this magnitude. So the record, to be clear, is not that this is just litigation, and again, she doesn't interact with litigators. The record is in the discovery that we obtained as part of this litigation, JA802. There's a long list of names. And if you look at those names, what we're saying is that there's over a dozen of those lawyers are restructuring lawyers that work on the team. And that list is only expected to grow as this goes towards trial. So the risk, that ever-increasing circle of people that have to get it exactly right every time for it to be compliant. So we've been struggling, I know, about what that means. What if you have a perfect screen? You know, 110 tells you that's the end of the inquiry, right? If you have a good screen, it's over. The reason why we've harped on the fact that 110 is not the beginning and the end of your inquiry, and that you have to do more, and we're asking your honors to do more, and we ask the bankruptcy court to do more, is that's what the ABA tells you. The ABA, even in Resolution 109 that I've read before, says that you have to do more. There are circumstances where you look beyond the rule. You have to, because the ABA has its interests, attorney mobility understood. I'm an attorney. I'd like to stay as mobile as possible. I understand that. But that concern, the narrow focus of the ABA, is not your honors purview solely. It is to look at the integrity of the proceedings, something your honor mentioned. This is where I would come back to the standard overview. Do you agree that we're looking at the overall decision on the disqualification motion for abuse of discretion? And within that, we're looking at clear error for factual findings and erroneous legal conclusions or applications of laws of facts. Is that our standard? So I think I opened up Judge Porter with saying that it could be de novo because the record, in our view, is closed, and it is undisputed. It was submitted in declarations. I remember that. But accepting your honor's standard, if that is it, we believe it's clear and it's not closed. And we're comfortable, even if that is the standard, why the court blinded itself, blinded itself to evidence, to use the phrase that Mary Alford said, to see what is plain, to see what the sun lights up willingly. He ignored it and said, okay, I'm not going to look at the marriage. I'm not going to look at this because you're being, you know, this is a shabby attempt at trying to go after someone's reputation. Even though we controlled discovery, we didn't depose witnesses, we didn't look at everybody's emails, we tried to be as neat and tight about this for those reasons. And within those four corners, you can't ignore what the trust has said, this is an exception. They conceded in their brief. The exception to, hey, screen solved everything, 110 is good, they admitted it. Well, there's an exception to that when there's a history of noncompliance. My first question to you, or at least one of my first questions said, what's the concrete harm? And you said it's a risk. And now you had discovery and you found no violations, hence that risk hasn't materialized, no violations of the screening process. And so it seems that we're in a strange place where we say the problem is the risk, then we have screens in place and we say they mitigate the risk, of course, and then we have no deficiency in the record with the screens. We might have deficiencies at 1.7 or 1.9, but my view is that 1.10 takes problems, 1.7 or 1.9 problems, and gives solutions through screens. And so those problems at one level are distant from what the screens are and you found no problems as far as I can tell with the screening process. Your Honor, just to be very clear about what discovery was and what it was not, we did not seek documents, we didn't look to see if there were violations, and the reason was simple. In litigation in response to interrogatories, the trust said, and I quote, to the extent that the trust or widened case is compelled to respond to or undertake any action, meaning discovery, in response to any interrogatory in a manner that leads to the disclosure of privileged or confidential information belonging to YPF, the trust reserves all rights to use the information so disclosed in this manner for any and all purposes. So they weaponized any, if we were to go look for and say we need to look and see if our privileged information was sought, they said we will use it. We will weaponize it against you. And that is the risk and why we didn't. So to be very clear, we did not go look to see if there were violations because by trying to identify that... Could you have challenged that response by the bankruptcy court and say that's an inappropriate response if you had a grievance with it rather than accept it? The risk was, but it's a real one, that if we go ask for and say these are things we want you to look for, those are the secrets. And that has never been disputed, that she has what we think are the nuclear launch codes, that she knows what our settlement strategy is, she knows what our mediation strategy is, she knows what our litigation strategy is. That has never been in dispute. And so even if it's on a use of discretion standard, a clear error standard, the evidence is you can't ignore what you see and what's been admitted. What we're asking your honors to do is to see what is playing. And that undisputed record against the ENSO factors which have been successfully used within the district courts of this circuit for over two decades. There hasn't been this run on uncertainty or unpredictability with respect to attorney mobility or choice of counsel. It balances those factors carefully. And you need that because strict compliance to a screen is not a panacea. Even the trust acknowledges that. All right. Thank you very much. Thank you, your honors. Of course, thank you to all counsel for their vigorous argument this morning. We'll take the matter under advisement. And I believe we have come to the end of our day.